**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

THE ESTATE OF RICHARD BARD
and DANA GERMAN-BUNTON, as            1:17-cv-01452-NLH-AMD
administrator *ad-prosequendum*
of THE ESTATE OF RICHARD              **OPINION**
BARD,

                Plaintiffs,

        v.

    CHRISTOPHER PUGLISI,

                Defendant.

**APPEARANCES**:

SOLOMON MORDECHAI RADNER
JOHNSON LAW, PLC
EXCOLO LAW PLLC
535 GRISWOLD ST.
SUITE 2632
DETROIT, MI 48226

CONRAD J. BENEDETTO
LAW OFFICES OF CONRAD J. BENEDETTO
1233 HADDONFIELD-BERLIN ROAD
SUITE 1
VOORHEES, NJ 08043

        *On behalf of Plaintiffs*

A. MICHAEL BARKER
TODD J. GELFAND
BARKER, GELFAND & JAMES
LINWOOD GREENE
210 NEW ROAD
SUITE 12
LINWOOD, NJ 08221

        *On behalf of Defendants*

**HILLMAN**, District Judge

This matter concerns claims by Plaintiff, Dana German-Bunton, the mother of Richard Bard, the decedent, arising out of the shooting death of Bard by Defendant City of Vineland Police Officer Christopher Puglisi.  Plaintiff claims that Defendant violated Bard's right to be free from the use of excessive force in violation of the Fourth Amendment of the U.S. Constitution. Presently before the Court is Defendant's motion for summary judgment.  For the reasons expressed below, Defendant's motion will be granted.

**BACKGROUND**

Plaintiff's Third Amended Complaint alleges the following:[1]

13. At the time of his death on April 17, 2016, Richard Bard was thirty-one (31) years old.

14. Richard Bard had been involved in a motor vehicle accident on January 13, 2013, wherein he sustained serious injuries to his legs.  Bard's injuries included an open fracture to his femur, a closed fracture to his femur, rib contusions, a pulmonary contusion and pneumothorax; for which the decedent had

---

[1] Since this action was filed, the Court has issued four opinions which dismissed numerous claims and defendants.  The operative pleading is Plaintiffs' Third Amended Complaint (Docket No. 51), which contains one count against Defendant City of Vineland Police Officer Christopher Puglisi brought pursuant to 42 U.S.C. § 1983.

pending surgeries.

15. Based on his existing injuries, it was not possible for Richard Bard to walk briskly, much less run, from the Defendant Officers.

16. On April 16, 2016, decedent, Richard Bard, and his girlfriend, Ebony Bonner, attended a birthday party at a friend's home located at the Walnut Villa Complex on Florence Avenue in Vineland, New Jersey.

17. At around 11:30 p.m., Richard Bard and an individual named Jonathan Bain agreed to leave the party and walk together to get cigarettes from another resident at the Walnut Villa Complex.

18. It is alleged by the Vineland police that around 1:00 a.m. on April 17, 2016, Richard Bard and Jonathon Bain were involved in a robbery of an individual near Seventh and Cherry Streets in Vineland.

19. It is further alleged that Richard Bard and Jonathon Bain fled on foot and were chased by the police.

20. A responding officer, Christopher Puglisi, shot at Richard Bard four times before Bard fell to the ground near East Avenue and Almond Street in Vineland.

21. Defendant did not provide adequate medical attention or first aid after he shot Mr. Bard even though he was on the scene and saw Mr. Bard lying in a pool of his own blood.

22. After the shooting, EMS was called. When EMS arrived, Richard Bard was found unconscious lying on the side of road in a pool of blood.  He had sustained two gunshot wounds, including one gunshot wound to his groin and one gunshot wound to his hip. He suffered substantial blood loss at the scene.

23. Richard Bard was pronounced dead at Inspira Hospital by Dr. William Martin at 2:05 a.m., on April 17, 2016.

24. After the shooting, family members of Richard Bard were advised that he sustained two broken wrists. No explanation was provided for how his wrists had been broken.

(Docket No. 51 at 2-3.)

Defendant's motion for summary judgment provides more details.  According to Defendant's statement of undisputed material facts (Docket No. 77-2), which the Court will deem undisputed:[2]

---

[2] Although Plaintiffs filed a belated opposition to Defendant's motion for summary judgment, it consists of one argument based on German-Bunton's deposition testimony.  (Docket No. 78.)  The opposition fails to comply with L. Civ. R. 56.1(a), which requires that an opponent to a summary judgment motion file "a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion."  According to L. Civ. R. 56.1(a), "any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion." Similarly, Fed. R. Civ. P. 56(e) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to

1.   Decedent Richard Bard was a "top leader" or "high ranking" gang member in the street gang known as the Bloods. (Exhibit 2, deposition of Plaintiff Dana German Bunton, page 54).

2.   On April 16, 2016, decedent Richard Bard attended an

---

properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it; or (4) issue any other appropriate order."

The Court finds it would be futile to provide Plaintiffs with additional time to properly oppose Defendant's motion because:

(1) Throughout this case, Plaintiffs have delayed the proceedings and have failed to comply with this Court's orders (see, e.g., Docket No. 44, in resolving Defendant's opposition to Plaintiffs' proposed third amended complaint because it contained claims the Court had previously dismissed, the Court stating, "Regurgitated claims that have already been dismissed twice and have no new basis for assertion cannot proceed, for all the same reasons the Court expressed in the prior two opinions," and further noting, "In light of past failures, Plaintiff is reminded that if the third amended complaint is not consistent with the law of the case as set forth in this and prior opinions the Court will consider appropriate sanctions."); and

(2) Defendant filed his motion on February 20, 2020 (Docket No. 77), but Plaintiffs failed to respond until this Court reached out to counsel in August 2020 to inquire as to whether they intended to file an opposition, at which time counsel filed the aforementioned incomplete opposition (Docket No. 78) and a motion to withdrawal as counsel (Docket No. 79). This Court administratively terminated Defendant's motion pending the resolution of Plaintiffs' counsel's motion to withdraw. The magistrate judge denied without prejudice counsel's motion (Docket No. 90), and Defendant's motion was reactivated. Overall, Plaintiffs have had a year and a half to submit an opposition to Defendant's motion in compliance with the Federal and Local Rules of Procedure, and Plaintiffs have failed to do so. Consequently, other than with regard to the testimony of German-Bunton cited in Plaintiffs' brief, the Court will deem the facts presented in Defendant's L. Civ. R. 56.1(a) statement of undisputed material facts as undisputed.

alleged birthday party at a friend's home located at the Walnut Villa Complex on Florence Avenue in Vineland, NJ. (DI 51, Third Amended Complaint, page 2 paragraph 16; Exhibit 11 pages 9-10; Exhibit 12, page 3; Exhibit 13 page 7).

3.   Plaintiff alleges that at or around 11:30pm, Bard and another individual named Jonathan Bain agreed to leave the party and walk together to get cigarettes. (DI 51, Third Amended Complaint, page 2 paragraph 17; Exhibit 12 page 3; Exhibit 12 page 5).

4.   Bain was a Blood Gang member from New York. (Exhibit 4, page 15).

5.   The Vineland Police Department had information from a confidential source prior that Bard and Bain had been involved in selling drugs in the area and were robbing subjects in the area and known to be together. (Exhibit 11, page 7).

6.   Richard Bard Sr., father of the deceased, reported to the CCPO during the subsequent investigation that Ebony Bonner, the mother of the deceased Bard's children, told him that she was with the deceased Bard and John Bain at an apartment in Vineland when they left with guns, Bain having said "someone is going to die tonight" before leaving. (Exhibit 4, page 6; Exhibit 11 page 12; Exhibit 12 page 3; exhibit 13, page 7).

7.   Richard Bard, Sr., told the CCPO Investigator Ron Cuff that "his son was not a good person and if he shot at the cops, he was trying to kill them, so he understands why the officers shot back." (Exhibit 4, page 6).

8.   At or around 12:58 a.m. on April 17, 2016, four separate calls came to the Cumberland County Communications Center reporting shots fired and someone hit in the head in the area of 7th and Cherry Streets, though it was later determined that the crime victim, Alejandro R. Abreu-Abreu had not been shot in the head. (Exhibit 3, page 9; Exhibit 12 page 2-3).

9.   Decedent Richard Bard and John Bain robbed Alejandro

6

Abreu-Abreu in the area of 7th and Cherry Streets in
Vineland. (Exhibit 3, p.3).

10.  Prior to the robbery, Alejandro Abreu-Abreu was at El
Coqui Restaurant helping the owner, Tony Marty, with the
business cleanup after which the two (Marty and Abreu-Abreu)
and another male named Secundino "Tony" Pena left around 1:00
a.m. Abreu left on his bicycle while Marty and Pena warmed
up Marty's pickup truck. (Exhibit 5, page 2; Exhibit 10, page
2; Exhibit 11 page 4; Exhibit 13 pages 8-9).

11.  In front of 7th Street, Abreu was attacked by two males
dressed in all black, pushed off his bicycle and struck 4-5
times in the head with a gun or guns.  As he yelled for
assistance, he was hit harder.  The attackers searched his
pockets, while shouting racial slurs, and took his cell phone
and possibly a $115 money order. (Exhibit 5, page 2; Exhibit
3, pages 1-2; Exhibit 10 pages 1-2, page 4-6; Exhibit 13
pages 8-9).

12.  Marty and Pena approached in Marty's vehicle during the
attack, when the suspects shot at least three rounds at
Marty's vehicle then fled. (Exhibit 5, page 2; Exhibit 11
page 4, 6).

13.  Secundino "Tony" Pena and Enemencio Gomez-Pena reported
that as they drove up in the pickup truck, the two black
males, later identified as Bard and Bain, shot at them, then
ran. (Exhibit 3, Cumberland County Prosecutor's Office
Internal Affairs Investigation Report of Detective Scott
Csaszar, p.1).

14.  Information was dispatched to the Vineland police,
after which Vineland Officer Maslanich located two suspects
matching the description. (Exhibit 3 at p. 2).

15.  Defendant Officer Puglisi was with Vineland Sgt. Scarpa
starting a meal break when they heard a dispatch of "shots
fired," so the two headed in the direction of where the
shots were reported. (Exhibit 1, page 16-17).

16.  Two additional radio transmissions which Defendant
Officer Puglisi heard on his way confirmed that shots had
apparently been fired and one suggested that there was a

possible victim with a gunshot to the head. (Exhibit 1, page 18).

17.  Detective Ryan Breslin of the CCPO later learned that Abreu-Abreu had sustained an injury to the head but that it was not a gunshot, and not life threatening, speaking to the staff at AtlantiCare Regional Medical Center (Exhibit 3, page 4).

18.  Defendant Officer Puglisi arrived at the scene of the Abreu robbery when other officers were already at that location. (Exhibit 1 page 18).

19.  At the Abreu robbery scene, Defendant Officer Puglisi left, after Officer Maslanich, and went with Maslanish to look for the suspects. (Exhibit 1, page 18)

20.  Officer Maslanich first spotted two males fitting the "dark clothing" description in the area of Quince and East. (Exhibit 1, page 18).

21.  Defendant Officer Puglisi arrived in a separate police vehicle as Maslanich was exiting his vehicle. (Exhibit 3 at p.2; Exhibit 4 page 27).

22.  Defendant Officer Puglisi sensed one of the suspects was going to run so he tried to pull his police vehicle in front of the suspect to block him, but the suspect fled. (Exhibit 1, page 19).

23.  The two subjects, later identified as Bard and Bain, fled in two different directions. (Exhibit 3 at page 2; Exhibit 4 page 27).

24.  Officer Maslanich chased the suspect later identified as Bain. (Exhibit 3, page 2; Exhibit 4 page 27).

25.  Defendant Officer Puglisi pursued Bard on foot. (Exhibit 3, page 2; Exhibit 4, page 29; Exhibit 1, page 19).

26.  Officer Puglisi's MVR video captured Bard running

around his police vehicle. (Exhibit 1, page 22; Exhibit 13 page 4).

27. Surveillance video captured that Puglisi pursued Bard northbound on South East Avenue in the area between the west curb line and the residences on the west side of South East Avenue. (Exhibit 3, page 4).

28. Defendant Officer Puglisi shouted repeatedly at Bard to stop and show his hands while chasing Bard and with the aid of a flashlight on his weapon, observed Bard reach into his waistband, then observed something silver in Bard's hand. (Exhibit 4, page 30; Exhibit 1 page 14; 19, 26; Exhibit 13 page 4).

29. Defendant Puglisi was shot at, at least two times, during the foot pursuit. Puglisi was shot at from the direction of Bard. (Exhibit 3, page 2; Exhibit 4, page 30 Exhibit 1, pages 23-24). Puglisi is certain that Bard was firing at him while Bard was still running from him. (Exhibit 1, pages 36-37; Exhibit 13 pages 11- 13).

30. Defendant Officer Puglisi immediately made an evasive move when he saw the silver object in Bard's hand and heard the first shot pass by his head; Puglisi described hearing a big explosion and his ear popped as something went by, Puglisi estimates two inches from his ear. (Exhibit 4 page 4; 8; 11-12; Exhibit 1, page 19, 23, 27; Exhibit 13 pages 12-13).

31. Defendant Officer Puglisi returned fire, striking Bard, with Bard getting off at least one more shot while Puglisi returned fire. (Exhibit 3, page 2; exhibit 4 page 22, 30; exhibit 1, page 20, 27; Exhibit 13 page 11-13).

32. After firing a first set of shots, Defendant Officer Puglisi's gun jammed, so he replaced the magazine with a spare, when he observed Bard appearing to be falling to the ground. (Exhibit 1, page 20, 27; Exhibit 13, pages 11-13).

33. Vineland Police Officer Moughan saw Officer Puglisi chasing someone before seeing Puglisi dodge left and come back up with his weapon drawn and then saw and heard Puglisi

fire his weapon, but he could not see what or who Puglisi
fired at. (Exhibit 4, page 22; Exhibit 13 page 6).

34.  Puglisi saw that Bard began falling and believed Bard
might have been shot, so he approached and radioed that
shots had been fired. (Exhibit 1, page 20).

35.  Defendant Officer Puglisi repeatedly commanded Bard to
put his hands behind his back, thinking Bard might still
have the weapon which he had fired at Puglisi, under his
body, until Bard finally put his hands behind his back.
(Exhibit 1, page 20).

36.  Defendant Officer Puglisi tried to re-holster his
weapon but was unable due to adrenaline, so he placed his
weapon on the ground next to him and Officer Moughan, who was
covering Defendant Officer Puglisi, covered as Puglisi
approached Bard to handcuff him. (Exhibit 1 page 20).

37.  Officer Puglisi's handcuffs were stuck and as Puglisi
tried to free his handcuffs, Officer Maslanich ran by yelling
"cuff him." (Exhibit 1 page 20).

38.   Vineland Police Officer Joshua Shepperd arrived at the
location of the Bard shooting as Officer Puglisi was
handcuffing Bard and heard Puglisi ask Bard why Bard had
shot at him/Puglisi. (Exhibit 4 page 3; Exhibit 1 page 21).

39.  Bard looked at Puglisi as if to answer "I don't know"
and told the officers he was bleeding a lot. (Exhibit 1,
page 21, 27).

40.  Bard was taken to Inspira Medical Center (Vineland)
where he was pronounced dead. (Exhibit 3, page 2).

41.  The cause of death was determined to be a gunshot wound
to the thigh. The toxicology report was positive for alcohol
and marijuana. (Exhibit 3, page 20).

42.  A black automatic handgun with no magazine was found on
the south east corner of the former Cumberland Cleaners
property. (Exhibit 3 at page 5; Exhibit 4 page 13).

43.  On South East Avenue, a shell casing was found in the roadway near the curb line and a black handgun magazine was found on the sidewalk. (Exhibit 3, page 5).

44.  During processing of the scene of the Bard shooting, the New Jersey State Police located a silver-colored revolver on the north side of 300 South East Avenue, in the vicinity where Bard was secured, behind a large bush, later identified as a Smith and Wesson model .357 Magnum Revolver. (Exhibit 3, page 7; Exhibit 6, page 2; Exhibit 8, page 2).

45.  Inspection of the revolver at the scene revealed it had six (6) expended cartridge casings in its revolving cylinder. (Exhibit 8, page 2).

46.  The Smith and Wesson .357 Magnum revolver had DNA from two contributors, one of which was matched to Alejandro Abreu-Abreu. (Exhibit 7, page 4).

47.  Video surveillance was recovered from 306 East Avenue which showed Officer Puglisi chasing Bard northbound on South East Avenue between the west curb line and residences on the west side of South East Avenue. Officer Puglisi is seen pursuing Bard initially with no flashlight and depicts Puglisi activating the flashlight during the pursuit. (Exhibit 3, page 4).

48.  During processing of the scene CCPO investigators located a second shell casing in the grassy area in the vicinity of 300 South East Avenue between the sidewalk and west curb line near where the first shell casing had been located in the roadway. (Exhibit 3, page 8).

49.  Both shell casings were determined to be from Officer Puglisi's duty weapon. (Exhibit 3, page 8; 18).

50.  A bullet strike was located near the rear side door of 218 South East Avenue and a corresponding projectile, determined to be from Officer Puglisi's duty weapon, was located in the residence on the floor. (Exhibit 3 page 8).

51.  It was determined that this was the other of the two shots fired by Officer Puglisi, with the other having struck Bard. (Exhibit 3, page 8).

Defendant has moved for summary judgment arguing that the undisputed material fact show that his use of force against Bard was objectively reasonable and it did not violate Bard's constitutional rights.  Plaintiff has opposed Defendant's motion on one basis:  Bard's mother testified that the injuries Bard sustained in the January 13, 2013 motor vehicle accident, as well as his bronchitis, rendered him incapable of running the distance he is alleged to have run.

<u>**DISCUSSION**</u>

**A.   Subject Matter Jurisdiction**

Plaintiffs have brought his claims pursuant to 42 U.S.C. § 1983.  This Court has jurisdiction over Plaintiffs' federal claims under 28 U.S.C. §§ 1331, 1343 and 1367.

**B.   Summary Judgment Standard**

Summary judgment is appropriate where the Court is satisfied that the materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, or interrogatory answers, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(a).

An issue is "genuine" if it is supported by evidence such

that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor."  Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

As noted above, *supra* note 2, the Court will deem all the statements of material fact set forth by Defendant as undisputed for purposes of summary judgment, except with regard to Bard's mother's testimony regarding her son's inability to run.  <u>See</u> Fed. R. Civ. P. 56(e); L. Civ. R. 56.1(a).

### C.   Analysis

Section 1983 is not a source of substantive rights, but provides a vehicle for vindicating the violation of other federal rights.  <u>Graham v. Connor</u>, 490 U.S. 386, 393-94 (1989).  Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  To state a claim for relief under § 1983, a plaintiff must allege the violation of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed or caused by a person acting under color of state law.  <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988); <u>Piecknick v. Pennsylvania</u>, 36 F.3d 1250, 1255-56 (3d Cir. 1994).

For Plaintiff's claims against Defendant in his personal capacity, the qualified immunity doctrine governs the analysis.  "Qualified immunity shields government officials from civil

14

damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Reichle v. Howards, 566 U.S. 658, 132 S. Ct. 2088, 2093 (2012).  In order to determine whether a government official is entitled to qualified immunity, two questions are to be asked: (1) has the plaintiff alleged or shown a violation of a constitutional right, and (2) is the right at issue "clearly established" at the time of the defendant's alleged misconduct? Pearson v. Callahan, 555 U.S. 223, 236 (2009).  Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." Id.  It is the defendant's burden to establish entitlement to qualified immunity. Kopec v. Tate, 361 F.3d 772 (3d Cir. 2004).

In determining whether excessive force was used in effecting an arrest, the Fourth Amendment's "objective reasonableness" test is applied. Sharrar v. Felsing, 128 F.3d 810, 820-21 (3d Cir. 1997) (citing Graham v. Connor, 490 U.S. 386, 396 (1989)).  The objective reasonableness test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. (relying

on Graham, 490 U.S. at 396; Groman v. Township of Manalapan, 47 F.3d 628, 634 (3d Cir. 1995)).  "Other relevant factors include the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time."  Id.

Even though the determination of whether an officer acted in an objectively reasonable manner or made a reasonable mistake of law, and is thus entitled to qualified immunity, is a question of law that is properly answered by the court, not a jury, the Third Circuit has recognized that a judge should not decide the objective reasonableness issue until all the material historical facts are no longer in dispute.  Curley v. Klem, 499 F.3d 199, 211, 211 n.12 (3d Cir. 2007).

Here, there is only one fact in dispute: Bard's mother, German-Bunton, testified that due to a January 13, 2013 motor vehicle accident, which resulted in a pin in Bard's leg, and because of his bronchitis, Bard would not have been able to run the requisite distance testified to by Defendant and other witnesses.  (Docket No. 78.)

Even accepting German-Bunton's perception of her son's inability to run as true, the undisputed evidence from

16

Defendant, dash cam and surveillance video as described by Defendant's statement of undisputed facts, and other witnesses' eye-witness testimony, shows that Bard did indeed run.  The undisputed evidence shows that after beating and robbing a man who had been riding his bicycle, Bard and his accomplice shot at least three rounds at the man's friends who drove by in their truck, and ran away.  After police were notified of "shots fired" and it appeared at first that the man may have been shot in the head due to the severe head wounds, Defendant, who had been on a meal break, arrived at the scene of the robbery.  With this information, Defendant and another officer proceeded to look for the suspects in their separate patrol cars.  They spotted the suspects, and Defendant attempted to stop the suspects with his patrol car, but they ran in opposite directions.  Defendant pursued one suspect, who turned out to be Bard, on foot.

With the aid of the flashlight on his weapon, Defendant repeatedly yelled for Bard to stop, but Bard ignored Defendant's commands.  Defendant observed Bard reach into his waistband, then observed something silver in Bard's hand.  At this point, Bard shot at Defendant twice, with one bullet passing two inches from Defendant's ear.  Defendant returned fire, striking Bard, with Bard getting off at least one more shot while Defendant returned fire.

Aware that Bard fell to the ground and that he might have
been shot, Defendant approached Bard and repeatedly commanded
Bard to put his hands behind his back, thinking Bard might still
have his weapon under his body, until Bard finally put his hands
behind his back.  Defendant cuffed Bard, and he was transported
to the hospital, where he was pronounced dead from a gunshot
wound to the thigh.  The post-incident investigation, including
ballistic and DNA analysis, as well as witness interviews and
video footage, corroborate the above events.  Even when
considering Bard's mother's opinion as to his mobility in the
light most favorable to Plaintiff, no reasonable juror could
conclude that Bard did not flee from the robbery scene and later
the officers pursuing him when all the objective and uncontested
evidence proves conclusively that he did.

This series of uncontroverted events meets the <u>Graham</u>
objectively reasonable test, and presents the epitome of
<u>Graham</u>'s "split-second judgment" as to the use of force "in
circumstances that are tense, uncertain, and rapidly evolving."
<u>Salaam v. Wolfe</u>, 806 F. App'x 90, 93 (3d Cir. 2020) (quoting
<u>Graham</u>, 490 U.S. at 396-97).  Defendant was aware that Bard and
his accomplice had just robbed and possibly shot a bicyclist, as
well as shot three times at the bicyclist's friends, which are
severe crimes and posed an immediate threat to the public and
the officers.  Defendant encountered Bard who was actively

18

evading apprehension, and then Bard shot at Defendant two times, which clearly proved that Bard was armed, in addition to Defendant having observed Bard retrieve a silver object from his pants.  To protect himself and the safety of others it was objectively reasonable for Defendant to shoot twice at Bard who was actively shooting at him.  Defendant ceased fire once he saw Bard fall and immediately thereafter handcuffed Bard in case Bard's gun was under his body.  Where, as here, an "officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force."  Kisela v. Hughes, --- U.S. ---, 138 S. Ct. 1148, 1152 (U.S. 2018) (quoting Tennessee v. Garner, 471 U.S. 1 (1985)).

Thus, after a "highly individualized and fact specific" inquiry into the totality of the circumstances confronting Defendant, Santini v. Fuentes, 795 F.3d 410, 417 (3d Cir. 2015), it is evident that Defendant's actions were objectively reasonable.  As such, as a matter of law Defendant did not violate Bard's constitutional rights under the Fourth Amendment. Defendant is entitled to qualified immunity and judgment in his favor on Plaintiffs' claims against him.  See, e.g., Salaam, 806 F. App'x at 93, 93 n.3 (3d Cir. 2020) (affirming district court's finding that plaintiff's excessive force claims failed

as a matter of law, despite some disputed facts the district court properly explained that even when viewing the facts in the light most favorable to the plaintiff no reasonable jury could have concluded that the use of force violated his constitutional rights, and therefore the defendant officers were entitled to qualified immunity) (citing Kisela, 138 S. Ct. at 1152 (noting that "[q]ualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.")); see also James v. New Jersey State Police, 957 F.3d 165, 171-74 (3d Cir. 2020) (assessing the "clearly established" prong of the qualified immunity analysis and reversing district court's denial of qualified immunity to officer who shot a non-compliant suspect in split-second encounter, quoting Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011) – "When properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'" – and finding that the officer "deserve[d] neither label").

## CONCLUSION

For the reasons expressed above, Defendant's motion for summary judgment in his favor on Plaintiffs' Fourth Amendment claim must be granted.  An appropriate Order will be entered.

Date:   July 22, 2021            s/ Noel L. Hillman
At Camden, New Jersey            NOEL L. HILLMAN, U.S.D.J.